UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| RITA LAWRENCE, BARBARA KANN and RAYMOND K. FERWERDA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> BANK OF AMERICA, N.A., <br><br> Defendant. | Case No.: 8:09-cv-2162-VMC-TGW |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### I. INTRODUCTION

For nearly three years, Defendant Bank of America ("Defendant") aided and abetted the operation of a Ponzi scheme perpetrated by Beau Diamond ("Diamond"), a 27 year old swindler who claimed to be a currency trader. Armed with nothing more than a driver's license (no securities, commodities or financial services licenses of any kind), Diamond converted and defrauded funds from hundreds of investors. By the time he was caught, he had stolen approximately $37 million dollars from innocent investors in Florida and throughout the United States, many of whom were far from wealthy and lost their life savings.

Defendant learned of this unlawful enterprise through bank personnel including two experienced bankers in its Premier Banking Division who were assigned to provide

Diamond with "*close, personal attention*". Despite that knowledge, while motivated by large commissions and fees on bank deposits in the millions, Defendant continued to provide an array of bank services. These services were atypical and extraordinary under the circumstances, and they played a substantial and integral role in the growth and success of Diamond's fraudulent enterprise.

Attempting to deny innocent investors their day in Court, Defendant demands dismissal ignoring the well-pleaded allegations of the Complaint, and instead unilaterally deciding they are conclusory and formulaic. They are not. Plaintiffs have adequately pled the material elements of aiding and abetting an unlawful enterprise (based in fraud, breach of fiduciary duty and conversion) under Florida law. The Complaint includes specific facts drawn from direct evidence, circumstantial evidence and reasonable inferences of: (1) the existence; (2) general awareness; and (3) knowing and substantial assistance of the unlawful enterprise. Complaint at ¶44, 45, 46, 47 and 48. *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1008-1010 (Fla. 11th Cir. 1985).

In essence, Defendant's motion seeks a decision on the merits. A motion to dismiss for failure to state a claim, however, merely tests the sufficiency of the Complaint. *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984). Here, the facts alleged establish "a right to relief above the speculative level." *Bell Atlantic Corp. v Twombly*, 355 U.S. 544, 545 (2007).

## II. FACTS

### A. Bank of America Assigned Two Experienced Bankers To Diamond's Account

Diamond opened and maintained an account at Defendant's Siesta Key branch before the commencement of Diamond Ventures ("DV") and his claimed "expertise" as a Forex trader. *See* Complaint at ¶19. The branch only had approximately five employees when the DV Account was opened. *Id.* at ¶29. As Diamond collected monies from his unwitting victims, he began making exceptionally large deposits into the DV Account. *Id.* at ¶29. Based on the substantial size of those deposits, the DV Account was transferred from the Siesta Key Office to Defendant's Premier Banking & Investments ("Premier Banking") Division. *Id.* at ¶29. First, Joshua Ladwig ("Ladwig") was assigned as Diamond's Premier Banking Representative. Later that responsibility was shifted to Marcy Gilroy ("Gilroy").

Ladwig and Gilroy, as Premier Banking representatives, provided Diamond with "**close, personal attention**," "*priority customer service*" and "*expertise in banking and investment services.*" *Id.* at ¶29. At its highest level, the Premier Bankers' main role was to know and interact with the customer. Premier Bankers must complete specific "*Know Your Customer*" forms requiring: a complete history of the client, the nature of the client's business, the estimated amount of client wire transfers, check activity, and other specific inquiries of the client's business. *Id.* at ¶34. Customers receive priority service, have access to specialized product solutions, and are "*recognized as a valued client throughout the Bank of America family*". *Id.* at ¶30. Significantly, the Premier Banking Department made sure that its customers (who were the potential source for commissions, large fees and high-margin profits) were individually assigned to

3

experienced and knowledgeable bankers. Defendant touted their experience (at least ten years), knowledge and ongoing training. *Id.* at ¶31.

Consistent with these duties and responsibilities, Ladwig and Gilroy had nearly constant access to Diamond's accounts. They regularly reviewed those accounts because they had significant and concrete financial incentives to do so. Commissions were earned based on funds on deposit and could be earned by cross-selling a host of Bank of America financial products. *Id.* at ¶32 and 49. To facilitate those income-generating activities, for both Defendant and its Premier Bankers, Ladwig and Gilroy had access to Bank of America's internal computer system known as "*Connection*". *Id.* at ¶33. Each morning, the "*Connection*" system would update them in real time with the major deposits, withdrawals and wires (in and out) on their clients' accounts. *Id.* at ¶33. They received, in effect, the "who, what, where, when and how" of the Diamond's account activity. Significantly, they knew where money had been received from, where money was going and how Diamond was systematically looting the funds provided by innocent investors.[1] *Id.* at 40.

### B. Diamond Tells Bank of America He Is Operating An "Investment Club"

As part of the "*Know Your Customer*" inquiry, Diamond advised his Premier Bankers that he was operating an "*investment club*" and the money in his account were funds from club members. *Id.* at ¶34. Ladwig and later Gilroy authorized and supervised DV's so-called "*investment club*" account, an account that was strictly prohibited by

---

[1] Providing Ladwig and Gilroy with additional knowledge and a level of control over Diamond's unlawful enterprise was a Bank policy requiring that client wire transfers over $10,000 be approved by the Premier Banker or other authorized officer of Defendant.

4

Defendant's policy. *Id.* at 35. They had real time access to and the ability to review all transactions in that account. *Id.* at ¶33. From 2006 through 2009, Ladwig and Gilroy had regular access to and reviewed the account activity and statements for the DV and Beau Diamond accounts as part of their ordinary duties. *Id.* at ¶33. In the execution of those duties, they learned the following facts: (1) account statements reflecting that upwards of $37,600,000 was deposited by some 200 investors in period of less than 32 months following the formation of an investment company by 27 year-old Diamond. *Id.* at ¶40; (2) upwards of $15,400,000 was transferred by Beau Diamond from the DV Account to foreign exchange companies by wire during the 32-month period, with such entities being identified on the wires and statements. *Id.* at ¶40; (3) the account statements revealed no transfer by Forex of profits from Diamond's foreign exchange trading. *Id.* at ¶40; (4) Diamond had no independent wealth, nor did he deposit any of his personal funds into the DV Account. *Id.* at ¶40; and (5) despite the lack of profits realized on forex investments, over $15,600,000 (in over 2300 separate checks and wires) was paid out of the DV Account in monthly payments over the 32-month period to investors. *Id.* at ¶40.

Ladwig and Gilroy also learned Diamond used investor funds to directly reimburse himself for personal expenses totaling $182,500. *Id.* at 40. Those expenses included monies paid to two Las Vegas casinos. *Id.* at 40. He also paid himself a total of $795,000 from November of 2006 through October of 2008, (which included a $500,000 transfer to his personal account at Defendant). *Id.* at 40. In addition, Diamond engaged in a number of dubious and suspicious transactions, including wiring significant sums overseas; paying a New York attorney $1,625,000, and making payments to several

individuals and corporations with no relationship to his so-called "investment club". *Id.* at ¶40.

### C. Bank of America Provided Substantial Assistance

Notwithstanding their awareness that Diamond was involved in an illegal enterprise, Defendant offered and provided an array of banking services that were critical to Diamond facilitating and maintaining his unlawful operation. These services are described in the Complaint with particularity:

- Providing wire transfer capability so investor funds could be rapidly diverted to Diamond's personal accounts, to friends and family, and off shore.;

- Allowing the co-mingling of accounts to facilitate and make possible the success of DV;

- Providing access to unlicensed trading in the forex markets; and

- Providing a banking platform, complete with hands-on, personal attention and customer service, that made the conversion of investor funds possible.

In addition Defendant provided significant and atypical services including:

- Wire transfers to unrelated businesses, Las Vegas Casinos, and family members;

- Allowing the operation of a multi-million dollar investment club with hundreds of members in violation of the bank's clear prohibition;

- Co-mingling business and personal accounts;

- Failing to report suspicious transactions to compliance; and

- Approving the wire transfer of millions overseas without obtaining explanation or verification;

*Id.* at ¶40, 46 and 47.

## III. ARGUMENT

### A. Legal Standard

In ruling on a motion to dismiss, a district court must accept all allegations made in the complaint as true and construe them in the light most favorable to the plaintiffs. *Durden v. Citicorp Trust Bank*, FSB, 2008 U.S. Dist. LEXIS 39963 (M.D. Fla. May 16, 2008), (*citing Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004)). The reviewing court must favor the plaintiffs with all reasonable inferences made from the allegations in the complaint. *Durden*, citing *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1572, 1573 (11th Cir. 1990). The material may be either direct or inferential, but is required to be factual. *Durden* (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007); *Jacskon*, 372 F.3d. 1250, 1262-63 (11th Cir. 2004).

Plaintiffs must only raise sufficient factual allegations "to raise a reasonable expectation that discovery will reveal evidence of" the elements of the alleged counts. *Twombly*, 127 S. Ct. at 1965 (2007). In sum, a complaint must simply provide the grounds of entitlement to relief and raise a right to relief above the level of mere speculation. *Twombly*, 550 U.S. 544, 555 (2007); *see also, Durden*, at *6. The United States Supreme Court recently held that to survive a motion to dismiss, a complaint must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937 at 1949 (U.S. 2009) (quoting *Twombly*, 550 U.S. at 570).

Interpreting this standard, this Court in *Durden* emphasized a two-dimensional approach to evaluating the sufficiency of a claim at the motion to dismiss phase.

> First, the Court must determine whether the complaint addresses all the material elements necessary to recover under some legal theory. Second, the Court must determine whether the complaint addresses these elements with factual material sufficient to raise a right to relief beyond mere speculation.

*Durden,* at *3. (Emphasis added).

Applying this standard demonstrates Plaintiffs right to proceed to discovery with their well-pleaded claims and warrants the denial of Defendant's motion to dismiss.

### B. The Complaint Sufficiently Alleges Defendant's "General Awareness" of Unlawful Conduct

Defendant concedes, indeed repeatedly throughout its memorandum, that Plaintiffs have established only a *"general awareness"* of Beau Diamond's wrongdoing. *See, e.g.* Defendant's Memorandum, p.13. What Defendant fails to acknowledge or accept is that a *"general awareness"* is the precise form of knowledge required under Florida law to satisfy at the pleadings stage the first element of "aiding and abetting".

> [A] person may be held as an aider and abettor only if some other party has committed a crime or a securities law violation, if the accused party has **general awareness** that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

*Rudolph v. Arthur Anderson & Co.,* 800 F.2d 1040, 1045 (11th Cir. 1986), *cert. denied,* 400 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987) (emphasis added); *Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1009 (11th Cir. 1985) ("General awareness" is generally inferred from the surrounding circumstances") (quoting *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94-95 (5th Cir. 1975) (citations omitted)). *See also, The U.S. Securities & Exch. Comm. v. Surgilight, Inc.* 2002 WL

31619081 (M.D. Fla.); *In re Checkers Sec. Litigation*, 858 F.Supp. 1168, 1178-79) (M.D. Fla. 1994).[2]

Furthermore, the Eleventh Circuit has made clear that *"general awareness"* can be established for pleading purposes by allegations based on "circumstantial evidence" or "reckless conduct". *Woods*, 765 F.2d at 1010 (citations omitted). Moreover, the court specifically noted that the general awareness requirement is typically satisfied using inferences. "In discussing the 'general awareness' element, the court noted that the surrounding circumstances and expectations of the parties were critical, because knowledge of the existence of a violation must usually be inferred." *Woods, Id.*[3]

Here, we do not have the benefit of fact witness or expert testimony, or even documents produced in discovery. Instead we have well-pleaded facts of general awareness, if not actual knowledge, of an illegal enterprise based upon the information available to Defendant's Premier Bankers, Ladwig and Gilroy, and the observations of bank personnel at Defendant's tiny Siesta Key branch. Through the *"Connection"* system and other bank databases, these Premier Bankers had the right and ability of access to Beau Diamond and DV accounts in real time, including approval of wire transfers in excess of $10,000. A review of those accounts would illustrate: 1) the existence of an unauthorized investment club; 2) substantial deposits (without any relationship to a

---

[2] Whether by design or simply mistake, Defendant claims the proper level of proof is "actual" awareness or knowledge. That is the wrong standard at the pleadings stage. Only after a party has been afforded discovery -- at the "proof" stage – must they establish "actual knowledge". *See Rudolph v. Arthur Anderson & Co.*, 800 F.2d 1040, 1045 (11th Cir. 1986), quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975).

[3] Ignoring the well-reasoned and developed case law in this Circuit, Defendants curiously proclaim that the "actual knowledge" test set forth in *Rosner v. Bank of China*, 2008 U.S. Dist. LEXIS 105984 (S.D.N.Y. 2002), a district court case in the Second Circuit, should govern. Defendants fail to address any of the relevant law in this Circuit and provide no basis for this Court adopting the analysis in *Rosner*.

legitimate business activity); 3) offshore transfers of funds almost immediately upon receipt; 4) the sending out of thousands of checks; 5) a systematic and ongoing looting of the DV investor funds by Beau Diamond; and 6) the paying of investors with new investor money and not revenues from trading or any other legitimate investment activity. Complaint at ¶44 and 45.

But not only did the Premier Bankers have the ability to know of Diamond's illegal enterprise, they had the motive to know. Ladwig and Gilroy stood to earn large commissions and fees from a customer like Diamond on his multi-million dollar monthly balances and on cross selling services on those funds on deposit.

These facts are hardly conclusory. They provide a detailed factual underpinning for "sound deductive reasoning" establishing Defendant's "general awareness" of Diamond's unlawful enterprise.

### B. The Complaint Sufficiently Alleges the Third Element of Aiding and Abetting: Knowing Substantial Assistance.

Proving that "substantial assistance" was provided knowingly, requires allegations of scienter on a sliding scale from: "recklessness" to "conscious intent." *Court Appointed Receiver of Lances Offshore, Inc. v. The Citco Group, LTD*, 2008 WL 926513 (S.D. Fla. 2008). In the instant case where Defendant had no duty to disclose Diamond's activities, the Defendant may be held liable only if facts alleged with specificity demonstrate scienter through allegations demonstrating "conscious intent" to aid the fraud. *Smith v. First Union National Bank*, 2002 WL 31056104, at *3 (S.D. Fla.). However, the requirement to plead "conscious intent" is not static and will depend on the type of assistance at issue. *Court Appointed Receiver*, 2008 WL 926513, at *6. The

degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. *Woodward*, 522 F. 2d at 97. Thus, if the transaction set forth in the allegations are atypical, extraordinary or lack business justification, "it may be possible to infer the knowledge necessary for aiding and abetting liability." *Id.*, see also *Woods*, 765 F.2d at 1012. Evidence of whether the assistance is "knowing and substantial" is to be determined based on the totality of the circumstances. *Rudolph v. Arthur Anderson & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986).

In the first instance, because Defendant (through information directly provided to its Premier Bankers Ladwig and Gilroy), had actual knowledge of Diamond's Ponzi scheme and that its financial services platform was assisting Diamond in its furtherance, the bank's ordinary business transactions alone can satisfy the substantial assistance element. *First Alliance Mortgage Company v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 993-994 (9th Cir. 2006). At the other end of the scale, if the transactions were atypical or lacked business justification, this Court can infer knowledge necessary for aiding and abetting liability. *Woodward* as quoted in *Smith*, 2002 WL 31056104 at fn. 4.

Defendant knew that it was substantially assisting Diamond's scheme. Knowledge may be inferred from a "conscious and specific motivation" to aid the fraud. *Court Appointed Receiver*, 2008 WL 926513, at *6. In this regard, "motive would entail concrete benefits that could be realized from the fraud." *Rosner*, 2008 U.S. Dist. LEXIS 105985, at 35. Ladwig and Gilroy made substantial commissions from the Diamond deposits and stood to make even more from cross-selling services on the deposits all of which provided the motive to establish the requisite knowledge. Moreover, this

knowledge is further evidenced by Defendant's affirmative acts in approving transactions that violated Defendant's rules and policies. Notably, authorizing the investment club, failing to report suspicious transactions to compliance, approving transfers unrelated to any legitimate business activity, and otherwise allowing Diamond to loot the investors funds for himself, and his friends and family. Complaint at ¶47. These acts also evidence substantial assistance. The bank's ordinary business transactions, to the extent any of the Diamond transactions can be so cavalierly classified, can also satisfy the substantial assistance element of an aiding and abetting claim, since Defendant actually knew those transactions were assisting the customer in committing the subject torts. *First Alliance*, 471 F. 3d at 993-994.

This Court can also infer knowledge based upon atypical transactions which lack business justification. The question of whether the transactions or services provided was atypical or typical must be viewed in light of all the circumstances. *See Woods*, 765 F.2d at 1012. Here, there was simply no business justification for Diamond's transactions and operation. Ladwig and Gilroy were aware of a host of "atypical" activities permitting an inference of knowledge, including: (1) the pattern of wiring or transferring monies from the DV account which was not related to the operation of a legitimate business but instead to benefit Diamond himself or his friends and family; (2) wires overseas; and (3) the dramatic number of deposits and withdrawals (including over 2,300 checks) all of which were stark evidence of a Ponzi scheme. *Smith*, 2002 WL 31056104 at *3-4. As in *Smith*, these activities were suspicious or atypical based on industry standards, banking

laws and regulations and, most importantly, Defendant's own policies and procedures, including a prohibition against investment club accounts. *Smith*, at *4.

Judge Ursula Umgaro-Benages in Smith summarized this standard and applied it to facts very similar to those before this Court. In *Smith*, plaintiffs alleged that defendant, First Union National Bank, aided and abetted the breach of fiduciary duty owed by Cyprus Funds to them. First Union filed a motion for summary judgment arguing that plaintiffs had not proven that First Union had "actual knowledge." Judge Umgaro-Benages outlined the standard for aiding and abetting, quoting *Woods* and *Woodward*, stating that the Eleventh Circuit requires that the accused party have a general awareness of his role in some activity that is improper and that the aider-abettor provided knowing and substantial assistance. *Smith*, at *7. In responding to First Union's motion, plaintiffs relied primarily on the "inference of knowledge" as supported by expert testimony regarding "atypical" activities that would have been known to the bank through First Union's employee, Diaz, who served as the fund's "relationship manager." *Smith*, at *10. These atypical activities included, but are not limited to, the following: 1) the Cyprus accounts were among the largest that the two First Union officers were handling; 2) numerous wire transfers were made which sent monies to entities that were obviously not related to the activities of a mutual fund, including transfers to Eris Bartoli, his family members, and entities he controlled; and 3) there was a pattern of wiring out monies that had been deposited into Cyprus' accounts at First Union.

Judge Umgaro-Benages determined that the expert report based on these activities was sufficient to create a disputed fact as to whether or not Diaz acted with the requisite

"conscious intent" to aid the fraud. *Smith*, at *5. In sum, the atypical banking transactions and the employee's failure to report suspicious activity were determinative in raising a disputed fact about the level of knowledge regarding the fund's wrongful purpose.[4] *See Smith*, at *5.

Comparison of the facts alleged here and those in Smith demonstrate that Plaintiffs have alleged sufficient facts to demonstrate a strong inference that Defendant knowingly substantially assisted Diamond's scheme. The inference "is neither conclusory nor unwarranted, but rather represents sound deductive reasoning gleaned from the facts contained in the complaint." *Surgilight, Inc.* 2002 WL 31619081, at *3 (citations omitted). Substantial assistance does not require Defendant know all of the details of Diamond's fraud. The circumstances alleged evidences Defendant's awareness that Diamond's scheme served only to defraud Diamond's clients; the circumstantial evidence surrounding Diamond's banking transactions, "were suspicious, to say the least." *Woods*, 765 F.2d at 23.

### C. **Plaintiffs Sufficiently Meet the Pleading Requirements of Rule 8(a) and 9(b)**

Defendant seeks dismissal of the Complaint claiming Plaintiffs have not adequately pled fraudulent conduct. (*See* Defendant's Memorandum at 13). Attempting to support that position, Defendant blithely concludes Plaintiffs have pled:

---

[4] Judge Umgaro-Benages relied on one additional piece of evidence which was a statement made by Diaz in deposition. Here, we are not at the summary judgment stage, but are limited to mere pleadings. Judge Umgaro-Benages' reliance on deposition testimony provides further support for Plaintiffs' contention here that this case should be allowed to proceed to discovery.

> no factual content that will allow a reasonable fact finder to conclude Bank of America had any awareness or knowledge of Diamond's alleged Ponzi scheme or substantially assisted that scheme.

Defendant's Memorandum, at page 7.

For claims that involve allegations of fraud (Count 1), Federal Rule of Civil Procedure 9(b) requires the Court to make a further assessment. As stated in Rule 9(b) itself:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. *Malice, intent, knowledge, and other condition of mind of a person may be averred generally.* [Emphasis added.]

Fed. R. Civ. P. 9(b). However, "[R]ule 9(b)'s heightened pleading standard 'is not an invitation to disregard Rule 8's requirement of simplicity, directness, and clarity' and has among its purposes the avoidance of unnecessary discovery." *Paulus v. Pacific Sands, Inc.*, No. 07-655, 2007 WL 2481935, at *10 (E.D. Cal. Aug. 29, 2007) (*quoting McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996)). The Eleventh Circuit has specifically cautioned against extending Rule 9(b) so as to nullify Rule 8's broad policy of notice pleading. *Friedlander v. Nims*, 755 F.2d 810, 813 n. 3 (11th Cir. 1985) ("Rule 9(b) must not be read to abrogate Rule 8...and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directive of Rule 9(b) with the broader policy of notice pleading"). Furthermore, where a fraud allegedly occurred over a period of time and the transactions were numerous, Rule 9(b)'s requirement that the circumstances of fraud be stated with particularity is less stringently

applied and less specificity is required. *United States v. Hempfling*, 431 F. Supp. 2d 1069, 1075 (E.D. Cal. 2006); *Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*, No. 08-4376 (JBS), 2009 WL 961426, at *6 (D.N.J. Apr. 8, 2009).

In claiming that Plaintiff has failed to allege fraud in accordance with Rule 8(a) and 9(b), Defendant conveniently ignores *"the forest from the trees"*. Countless wire transfers and deposits, over 2,300 checks issued to individuals, transfers from business accounts to personal accounts, and even evidence of large payments to certain individuals and Las Vegas casinos in and of themselves do not prove anything. But this conduct must be viewed in totality and in the context of facts not considered by Defendant. Significantly, Diamond advised his Premier Bankers he was operating an "investment club". *See* Complaint ¶35. Moreover, Defendant had no basis upon which to conclude that Diamond was involved in any legitimate business activity. Diamond had no training, no employees, no business licenses and no legitimate purpose supporting his deposit and re-distribution of tens of millions of dollars in just a short time period. *See* Complaint ¶9.

Defendant cannot ignore circumstantial evidence and the inconvenient and revealing inferences drawn from that evidence. Through its Premier Bankers and Siesta Key Branch employees, Defendant's had knowledge of the fraud. The fact that they ignored these facts does not mean they do not exist or were not pled sufficiently.

Defendant also claims that Plaintiff has failed to demonstrate the *"who, what, where, and when"* of a sufficiently pled complaint for fraud. Even a cursory review of the Complaint demonstrates that position is without merit. The **"who"** were Defendant's Siesta Key personnel (all five of them) and two Premier Banking Representatives:

Ladwig and Gilroy. The requisite *"what"* is illustrated by the detailed allegations describing the acts taken by Ladwig and Gilroy as they fulfilled their duties to Beau Diamond. The *"where"* is both the Siesta Key branch and offices of Ladwig and Gilroy. The *"when"* is determined by the various dates services were provided to Diamond by Defendant.

### D. Plaintiffs Have Sufficiently Pled Conversion and Breach of Fiduciary Duty

Defendant claims that Plaintiffs have failed to plead the elements of conversion and fiduciary duty. Accordingly, the claims of "aiding and abetting" must be dismissed because the predicate (substantive wrong) cannot be established. Defendant's argument is without merit. Properly construing the inferences from the allegations of the Complaint make clear that Plaintiffs have sufficiently alleged both conversion and breach of fiduciary duty.

#### 1. Conversion

Defendant's argument that the converted funds must be identifiable is not supported under Florida law. The fact that the monies that have been converted were comingled does not destroy the claim. *See Eagle v. Benefield-Chappell, Inc.*, 476 So.2d 716 (Fla. App. 4 Dist. 1985) (the money was not required to be kept in a separate account but could be, and was, comingled with other funds). Simply put, under Florida law, "[w]here a person having a right to possession of property makes demand for its return and the property is not relinquished, a conversion has occurred". *Senfeld v. Bank of Noval Scotia Trust*, So.2d 1157, 1161. (Fla. 3d DCA 1984).

Further, if Diamond obtained the investor funds for a specific purpose and is expressly directed to use the funds for that purpose only, use of those funds for another purpose is conversion. *Bergen Brunswig Corp. v. State, Etc.* 415 So.2d 765,767 (Fla. 1st DCA 1982). Here, Diamond was only supposed to invest a fraction of the funds, 15% and hold the rest for his client in accordance with his agreement with the investors. Complaint at ¶24, 25. Diamond however, used those funds for his own purpose in violation of the agreement. His unauthorized use of these funds constitutes conversion under Florida Law. *Bergen*, 415 So.2d at 767.

### 2. **Breach of Fiduciary Duty**

Under Florida law, a fiduciary relationship exists when one party depends upon a second party in some undertaking by the other party to "advise, counsel and protect the weaker party". *See Lanz v. Resolution Trust Corporation*, 764 F. Supp. 176 (SD Fla. 1991); citing *Cripe v. Atlantic First Nat. Bank*, 422 So.2d 820 (Fla. 1982). In the instant case, Defendant claims no fiduciary relationship exists because Diamond's relationship with investors was merely an "arms length" transaction.

Depositing monies in a savings and loan for a fixed rate of interest might be an arms length transaction (*see Anderson National Bank v. Luckett*, 321 U.S. 233 (1944)), but that is hardly the type of relationship at issue in this case. Diamond took on the role of the fiduciary, he proclaimed his expertise in Forex trading and had the discretion to make any trades he saw fit. The investors not only placed their trust in him, he acknowledged and accepted that trust and thus the duty was established. *See Barnett Bank v. Hooper*, 498 So.2d 923 (Fla. 1986).

## CONCLUSION

For the reasons set forth herein Defendant's Motion to Dismiss should be denied.

Respectfully Submitted

*/s/ Randolph L. Smith*
Randolph L. Smith, Esq.
rsmith@lakinsmith.com
**Lakin Smith, P.A.**
1401 Manatee Avenue West, Suite 1100
Bradenton, FL 34205
Phone: (941) 746-5529
Fax: (941) 750-6529

Andre R. Perron
arperron@opnlawgroup.com
**Ozark, Perron & Nelson, P.A.**
2816 Manatee Avenue West
Bradenton, FL 34205
Phone: (941) 750-9760
Fax: (941) 750-9761

Steven N. Berk
steven@berklawdc.com
Christopher Nidel
chris@nidellaw.com
**Berk Law PLLC**
1225 Fifteenth Street, NW
Washington, DC 20005
Phone: (202) 232-7550
Fax: (202) 232-7550

Attorneys for Individual and Representative Plaintiffs Rita Lawrence, Barbara Kann and Raymond K. Ferwerda. I.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 29, 2010, I electronically filed the following with the Clerk of Court by using the CM/ECF system and service was made on the following counsel of record in the manner indicated below:

Benjamin H. Hill, III, Esq.
Casey G. Reeder, Esq.
Hill, Ward & Henderson, P.A.
3700 Bank of America Plaza
101 E. Kennedy Blvd.
Tampa, FL 33602
*Via CM/ECF Notification*

Sharon L. Rusnak, Esq.
Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
*Via U.S. Mail*